Filed 1/22/26  P. v. Manzanares CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN MANZANARES,<br><br>    Defendant and Appellant. | G064249<br><br>(Super. Ct. No. 05WF3659)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Kimberly Menninger, Judge. Reversed and remanded with directions.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

Juan Manzanares was convicted in 2008 of one count of first degree murder for the shooting death of Abraham Ortega and three counts of premeditated attempted murder.[1] In 2021 Manzanares filed a petition for resentencing pursuant to Penal Code section 1172.6.[2] The trial court denied Manzanares's resentencing petition after conducting an evidentiary hearing under section 1172.6, subdivision (d). Manzanares appeals from the order denying his petition.

We conclude the trial court misidentified the relevant life-endangering act and thereby used an incorrect legal standard for determining Manzanares's mens rea for aiding and abetting implied malice murder. We therefore reverse and remand with directions to the trial court to conduct a new evidentiary hearing using the correct life-endangering act and consistent with this opinion.

## FACTS

Hard Times and Santa Nita are rival criminal street gangs. Manzanares was a member or associate of Hard Times. The murder victim, Abraham Ortega, was a member of or affiliated with Santa Nita.[3]

---

[1] The first degree murder conviction was later reduced to second degree murder pursuant to *People v. Chiu* (2014) 59 Cal.4th 155.

[2] Further code references are to the Penal Code.

[3] The prosecution's gang expert testified that because Ortega was part of a sub-clique of Santa Nita called the Santa Ana Playboys, and his older brother was an active participant in Santa Nita, Ortega himself was an active participant in Santa Nita at the time of the shooting.

Conflicts between Hard Times and Santa Nita gang members were not uncommon. Three days before the shooting that is the subject of this case, Juan Reyes, a Hard Times member with the moniker of Turtle, conducted a "hit–up"[4] of Ortega on the Santiago High School campus. Members of both Hard Times and Santa Nita attend Santiago High School even though it is within territory claimed by Hard Times. On the day before the shooting in this case, a prosecution witness saw a "tagging" in which "Hard Times" had been crossed-out and "Santa Nita" written in its place. Such cross-outs by a rival gang in the other gang's claimed territory are a sign of disrespect and a direct challenge by the rival gang. However, according to a prosecution witness, during encounters between Hard Times and Santa Nita gang members, "nothing ever happens."

On December 6, 2005, at about 3:00 p.m., Manzanares, a former Santiago High School student, walked to the high school to meet some friends who were still students there. As Manzanares approached the back entrance to the school, he walked past a black jeep and saw four men, later identified as Ortega, Daniel Funes, Alejandro Chavez, and Santos Gomez, with shaved heads. Manzanares believed they might be Santa Nita gang members.[5] Two of the men were inside the jeep and the other two stood outside of it. The men

---

[4] A "hit-up" is any contact between rival gangs, such as exchanging angry stares, asking "where you from," or announcing allegiance to a member's group. Hit–ups often lead to violence.

[5] Funes, Chavez, and Gomez were believed to be members or associates of Santa Nita. Funes testified he was not a member but "tagged Santa Nita." Because the record does not reveal the exact nature of the respective relationships of Ortega, Funes, Chavez, and Gomez with the Santa Nita gang, we refer to them as the Santa Nita affiliates.

3

appeared to Manzanares to be "mad-dogging" him (giving him angry stares) which led Manzanares to believe "[t]hey meant trouble."

Manzanares continued walking through the back entrance and onto the Santiago High School campus. He met up with Baltazar Moreno, another Hard Times member, and asked him if he knew where Reyes was. Manzanares then tracked down Reyes at the school quad, where Hard Times members and associates were known to hang out. Manzanares told Reyes that the four suspected Santa Nita gang members were behind the school and suggested he and Reyes "check it out to see who they are."

Manzanares, Moreno, and Reyes walked toward the back entrance to the school in order to confront Ortega and his companions.

On the way, Manzanares used his cell phone to call Jesus Guerrero, another Hard Times gang member, three times. The record does not reveal the substance of the first call. During the second call, Manzanares told Guerrero to bring a gun (a "strap"). During the third call, Manzanares told Guerrero that "chonklas" (a derogatory term for Santa Nita gang members) were at the back of the school and informed Guerrero of where he could be found.

Manzanares, Moreno, and Reyes saw the black jeep along with Ortega, Funes, Chavez, and Gomez. Manzanares, Moreno, and Reyes approached Ortega and instigated a hit up. Manzanares asked Ortega and his group where they were from. Someone from Ortega's group replied, "Santa Nita." Moreno yelled back something like, "fuck Santa Nita." Someone yelled "fuck Hard Times." A fistfight broke out.

The fight started as a mismatch with four Santa Nita affiliates against Manzanares, Moreno, and Reyes. At one point, Manzanares was on the ground and getting pummeled by two of Ortega's companions. Hard

Times supporter Rene Garcia then joined in the fight to help Manzanares. Then Guerrero and Hard Times member Armando Solano came running up to the scene. Guerrero was holding a gun, and, upon seeing him, Ortega, Funes, Chavez, and Gomez ran to the jeep and hopped inside. As they started to drive away, Solano told Guerrero, "not to do it here," but someone else yelled "dump on him." At that point, Guerrero fired several shots at the jeep, one of which struck Ortega in the chest and killed him.

Manzanares testified he knew Guerrero had a gun and asked him to bring it because he was afraid the other men were armed. Manzanares expected that, at worst, there would be a fistfight and thought the only thing Guerrero would do with the gun was wave it "to scare them off." Manzanares testified he did not think Guerrero was going to shoot anyone and did not intend for anyone to get killed that day.

## PROCEDURAL HISTORY

### I.

### Trial, Conviction, and Posttrial

The prosecution charged Manzanares, Guerrero, Reyes, Solano, Garcia, and Moreno with the murder of Ortega and the attempted murder of Funes, Chavez, and Gomez. Manzanares was tried separately from the others.

In 2008, the jury found Manzanares guilty of one count of first degree murder (§ 187, subd. (a), count 1), three counts of premeditated attempted murder (§§ 187, subd. (a), 664, counts 2, 3, and 4), one count of shooting at an occupied vehicle (§ 246; count 5), one count of shooting in a school zone (§ 626.9, subd. (d); count 6), and one count of street terrorism (§ 186.22, subd. (a); count 7). The jury also found to be true various special

circumstance and enhancement allegations including, as to count 1, a gang special circumstance allegation under section 190.2, subdivision (a)(22).)

The trial court sentenced Manzanares, exclusive of concurrent and stayed sentences, to a prison term of life without the possibility of parole, plus a consecutive indeterminate term of 25 years to life, plus a consecutive determinate prison term totaling 60 years.

In 2010, on direct appeal, a panel of this court reversed the true findings on special circumstance allegation under section 190.2, subdivision (a)(22) due to instructional error. (*People v. Manzanares* (Mar. 19, 2010, G040381) [nonpub. opn.].) The judgment was otherwise affirmed. Upon remand, the trial court resentenced Manzanares to a term of 75 years to life, plus a determinate term of 60 years.

In 2018, upon a habeas corpus petition, a panel of this court reversed Manzanares's first degree murder conviction pursuant to *People v. Chiu* (2014) 59 Cal.4th 155, corrected several sentencing errors, and directed the trial court to conduct a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261. (*In re Manzanares* (June 19, 2018, G055101) [nonpub. opn.].) On remand, the prosecution declined to retry Manzanares and accepted a reduction of the conviction on count 1 to second degree murder. The trial court resentenced Manzanares, exclusive of stayed and concurrent sentences, to a term of 40 years to life in prison. That term consisted of 15 years to life for murder (count 1), plus 25 years to life for an enhancement attached to that count.

## II.

### Resentencing Petition Proceedings

In June 2021, Manzanares filed his petition for resentencing. In March 2023, Manzanares filed a supplemental brief asking the court to

6

reverse his attempted murder convictions due to recent amendments to section 1172.6.

The trial court found that Manzanares had made a prima facie case for relief and issued an order to show cause. An evidentiary hearing under section 1172.6, subdivision (d) was conducted on March 22, 2024. Both sides relied on the record of conviction, which included the reporter's transcript from trial, jury instructions, and jury verdicts. No evidence in addition to the trial evidence was presented. After hearing argument from counsel, the court took the matter under submission.

In May 2024, the trial court issued a written ruling denying Manzanares's resentencing petition. The court found that Manzanares "aided and abetted in the murder with implied malice." The court concluded: "The totality of the evidence supports a conclusion [Manzanares] is guilty of murder beyond a reasonable doubt. In summary, [Manzanares] intentionally gathered fellow Hard Times gang members to challenge members of Santa Nita, a rival gang; he called a fellow gang member, Jesus Guerrero, [whom] he knew had a gun; asked him to bring that gun to the location of the challenge; started a fight with the other gang by asking 'where are you from?' and beginning to fight; and continued fighting until the armed Guerrero showed up and began shooting at the Santa Nita gang members. The shots resulted in the murder of Abraham Ortega as he was trying to escape into the Jeep. [Manzanares] intentionally committed the above acts, the natural consequences of those acts were dangerous to human life, at the time he did these acts he knew his act was dangerous to human life, and he deliberately acted with conscious disregard for the human life of all of the people with whom he was fighting. [¶] [Manzanares] used words and conduct to aid and abet the shooter Guerrero in the commission of the life endangering act of

7

bringing a gun to a gang fight. [Manzanares]'s statements along with testimony and evidence submitted at the trial support the Court's conclusion that [Manzanares] knew of the intent of Guerrero to bring a loaded gun to the fight. [Manzanares] intended to aid Guerrero in the commission of that act by calling him, informing him of the anticipated confrontation, and asking him to bring that gun to the confrontation with the knowledge that bringing a loaded gun to a gang confrontation was dangerous to human life, still choosing to invite Guerrero to do so with conscious disregard for human life of the rival gang members."

## DISCUSSION

## I.

### Overview of Resentencing Under Section 1172.6

By legislation effective January 1, 2019, the Legislature amended the felony murder rule and eliminated the natural and probable consequences theory of liability as a basis for a murder conviction. (Sen. Bill No. 1437 (2017–2018 Reg. Sess.) Stats. 2018, ch. 1015, § 4; see *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*).) The felony murder rule was amended "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see § 189, subds. (a), (3).) Section 188 was amended to provide that, except in cases of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought." (§ 188, subd. (a)(3) as amended by Stats. 2018, ch. 1015, § 2.)

Section 1172.6 creates a procedural mechanism by which those convicted of murder, attempted murder, or manslaughter who could not be

8

convicted of murder or attempted murder under the law as amended could retroactively seek relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) Section 1172.6 provides, "[a] person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts." (§1172.6, subd. (a).)

To obtain relief under section 1172.6, a petitioner must file a petition alleging these three conditions have been met: (1) the petitioner was convicted based on a pleading "that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" (§ 1172.6, subd. (a)(1)); (2) the petitioner was convicted of murder, attempted murder, or manslaughter following a trial or plea agreement (*id.*, subd. (a)(2)); and (3) the petitioner could not now be convicted of murder or attempted murder as those offenses are presently defined (*id.*, subd. (a)(3)).

A defendant convicted of attempted murder is eligible for sentencing relief under section 1172.6 if that conviction was based on the natural and probable consequences doctrine. (§ 1172.6, subd. (a); *People v. Coley* (2022) 77 Cal.App.5th 539, 548.) A defendant convicted of attempted murder either as an actual perpetrator or as a direct aider and abettor is not eligible for relief. (*People v. Cortes* (2022) 75 Cal.App.5th 198, 204.)

9

If the court determines the petitioner has made a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id*., subd. (d)(3).) At the evidentiary hearing, the resentencing court sits as an independent fact finder. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

If the prosecution does not sustain its burden of proof under section 1172.6, subdivision (d)(1), then the court must vacate the prior conviction and any allegations and enhancements attached to that conviction and resentence the petitioner on the remaining charges. (§ 1172.6, subd. (d)(3).)

## II.

## Standard of Review

A trial court's denial of a section 1172.6 petition following a hearing under section 1172.6, subdivision (d) is ordinarily reviewed under the substantial evidence standard. (*Reyes, supra*, 14 Cal.5th at p. 988.) Under that standard, we review the record in the light most favorable to the order denying the petition to determine whether the evidence is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid*.) "[W]e defer to the trial

10

court's implicit credibility findings and accept all reasonable inferences from the evidence." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 482.) "But where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes, supra*, 14 Cal.5th at p. 988.)

## III.
## The Trial Court Erred by Denying Manzanares's Petition for Resentencing

A. *Aiding and Abetting Implied Malice Murder*

The trial court denied Manzanares's resentencing petition on the ground the evidence established beyond reasonable doubt he aided and abetted an implied malice murder. The trial court did not conclude, and the Attorney General does not argue, that Manzanares was the direct perpetrator or an aider and abettor in an express malice murder.

Murder is committed with implied malice when "the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'" (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) A defendant may directly aid and abet an implied malice murder. (*Reyes, supra*, 14 Cal.5th at p. 990.) "'[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.'" (*Ibid.*)

11

The elements of aiding and abetting an implied malice murder were recently confirmed by the California Supreme Court in *Reyes*: "'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes, supra*, 14 Cal.5th at pp. 990-991.)

B. *What Is the Life-endangering Act?*

To determine Manzanares's liability for aiding and abetting implied malice murder, we first consider what constituted the perpetrator's life-endangering act. In its ruling, the trial court found that life endangering act was "bringing a gun to a gang fight."

A life-endangering act "is the act that proximately causes death." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, fn. 27.) "'To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

12

There is no question that Guerrero was the perpetrator: The evidence conclusively established that Ortega was killed by a gunshot fired by Guerrero. The perpetrator's life-endangering act—the act which proximately caused Ortega's death—was, therefore, firing the gun at the Santa Nita gang members fleeing in the jeep. (*Reyes, supra,* 14 Cal.5th at p. 992 ["implied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act *committed by the direct perpetrator*, such as shooting the victim"].) (Italics added.)

*Reyes* is instructive. The defendant in *Reyes* met with a group of gang members in a park, where one gang member displayed a revolver he was carrying. (*Reyes, supra,* 14 Cal.5th at p. 985.) Several hours later, the defendant and several other gang members set off on their bicycles to an area on the edge of territory claimed by a rival gang. (*Ibid.*) One of the bicycle riders called out for a passing car to stop. (*Ibid.*) The car sped up instead, and the group chased after it. (*Ibid.*) While the group was stopped at an intersection, the car they were chasing made a U-turn and drove past them. (*Ibid.*) There was a gunshot, and the riders fled in different directions. The driver of the car was struck by a single gunshot. (*Ibid.*) The defendant was not the shooter. (*Id.* at p. 989.)

In *Reyes*, the Supreme Court concluded the trial court had erred by finding the life-endangering act was traveling with other gang members, one of whom was armed, into rival gang territory. (*Reyes, supra,* 14 Cal.5th at pp. 991-992.) The correct focus, the Supreme Court explained, is on the acts of the direct perpetrator: "[I]mplied malice murder requires attention to the aider and abettor's mental state concerning the life-endangering act committed by the direct perpetrator, such as shooting at the victim." (*Id.* at

13

p. 992.) Here too, the life-endangering act was shooting at the vehicle carrying the victim.

Although a homicide might have more than one proximate cause (*People v. Garcia* (2022) 82 Cal.App.5th 956, 963), "[t]o suffice for implied malice murder, the [perpetrator's] act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[] a high degree of probability that it will result in death.""" (*Reyes, supra*, 14 Cal.5th at p. 989.)

On this point too, *Reyes* is instructive. In addressing whether the defendant might have been the perpetrator, the court considered the issue of whether the defendant had committed an act that proximately caused the victim's death. (*Reyes, supra*, 14 Cal.5th at pp. 988–989.) The defendant had bicycled with fellow gang members into rival gang territory with knowledge that one gang member was armed. (*Id*. at p. 989.) The Supreme Court determined that while such conduct might give rise to a likelihood of a resulting gang confrontation, and possibly someone getting hurt or killed, that conduct was not enough to "give rise to a high degree of probability that death will result." (*Id*. at p. 989.) The court also stated that "acts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy th[e] causation requirement." (*Ibid*.)

Guerrero's act of bringing the gun to the anticipated confrontation with Santa Nita affiliates did not in itself give rise to a high probability that death would result. Rather, that act "merely create[d] a dangerous situation in which death [wa]s possible depending on how circumstances unfold[ed]." (*Reyes, supra*, 14 Cal.5th at p. 989.) Deeming a life-endangering act to be the act of Guerrero bringing the gun to the fight comes precariously close to a natural and probable consequences theory of

14

liability: Bringing the gun to a gang fight becomes life endangering only because a natural and probable consequence of doing so is the gun is fired and someone is killed.

C. *Remand Is Necessary to Permit the Trial Court to Make Findings Based on the Correct Life-endangering Act*

The trial court did not make findings on Manzanares's conduct and mental state concerning the relevant life-endangering act of firing the gun at the Santa Nita gang affiliates. Instead, the trial court found that Manzanares aided and abetted Guerrero "in the commission of the life endangering act of bringing a gun to a gang fight," that Manzanares "knew of the intent of Guerrero to bring a loaded gun to the fight," that Manzanares acted with "knowledge that bringing a loaded gun to a gang confrontation was dangerous to human life" and "with conscious disregard for human life of the rival gang members." By misidentifying the life-endangering act committed by the perpetrator, the trial court used the incorrect legal standard for determining mens rea for aiding and abetting implied malice murder. (See *Reyes, supra*, 14 Cal.5th at pp. 990–991 [using incorrect life-endangering act constitutes legal error].)

To determine whether Manzanares engaged in conduct which aided and abetted the life-endangering act and had the requisite mens rea for aiding and abetting implied malice murder, the questions to be answered are whether Manzanares: (1) engaged in conduct which aided and abetted the perpetrator (Guerrero) in the commission of the life-endangering act of shooting at Santa Nita gang affiliates, (2) knew Guerrero intended to shoot at the Santa Nita gang affiliates; (3) intended to aid Guerrero in shooting at the Santa Nita gang affiliates; (4) knew that shooting at the Santa Nita gang

15

affiliates was dangerous to human life; and (5) acted in conscious disregard for life by engaging in conduct which aided and abetted Guerrero in shooting at the Santa Nita gang affiliates. (See *Reyes, supra*, 14 Cal.5th at pp. 991, 992.)

Remand is appropriate for the trial court to make findings on those questions because "it is 'uncertain whether the trial court would have reached the same result using the correct legal standards.'" (*Reyes, supra*, 14 Cal.5th at p. 992.) We will therefore remand this matter to the trial court for a new evidentiary hearing using the correct life-endangering act.

Manzanares argues we should reverse with directions to grant his resentencing petition because the evidence is insufficient to support a finding he aided and abetted an implied malice murder. While Manzanares should not be foreclosed from making that argument at the new evidentiary hearing, we believe the trial court should have the opportunity to reexamine the evidentiary record and make findings in light of the correct life-endangering act.

Manzanares notes that the shooting occurred one day after his nineteenth birthday and "his relative youth also militates against a finding he personally acted with implied malice in this case." At the evidentiary hearing, counsel mentioned Manzanares's age but did not develop the argument. The trial court did not make findings on the effect of Manzanares's age and maturity level on his ability to form the requisite mens rea. Recent cases have held that youth is a relevant factor in the totality of circumstances relevant to whether a defendant had the mental state necessary for implied malice murder. (*People v. Jimenez* (2024) 103 Cal.App.5th 994, 1001–1004; *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–418.) At the new evidentiary hearing, the trial court should consider Manzanares's age and

16

maturity level at the time of shooting and their effect on his mental state. The court may, in its discretion, permit additional evidence on that subject.

D. *Attempted Murder*

The trial court did not address Manzanares's convictions on counts 2 through 4 for attempted murder. Sentencing relief under section 1172.6 extends to attempted murder. (§ 1172.6, subd. (a).) In conducting a new evidentiary hearing following remand, the court shall make findings and rule on Manzanares's resentencing petition on the attempted murder convictions.

## IV.

## Correction to the Abstract of Judgment

In 2018 we granted Manzanares habeas corpus relief on his first–degree murder conviction (count 1) pursuant to *People v. Chiu* (2014) 59 Cal.4th 155. The prosecution declined a retrial and elected to accept a reduction from on count 1 from first degree murder to second degree murder. The amended abstract of judgment indicates, however, that Manzanares pleaded guilty to second degree murder. That is incorrect: Manzanares was convicted by a jury, not pursuant to a plea agreement. Manzanares requests that we correct this clerical error. The Attorney General concurs.

We have the ability to order the correction of clerical errors in an abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–187.) We shall direct the trial court to correct the abstract of judgment to reflect that Manzanares was convicted by a jury on count 1A.

17

## DISPOSITION

The order denying Manzanares's petition for resentencing is reversed and the matter is remanded to the trial court to conduct a new evidentiary hearing in accordance with this opinion. The trial court is directed to correct the abstract of judgment to reflect that Manzanares was convicted by a jury on count 1A and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.